# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| **LINDA EWING,** | |
| **Plaintiff,** | **No. 12 C 4908** |
| **v.** | |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,[1]** | **Magistrate Judge Mary M. Rowland** |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Linda Ewing filed this action seeking review of the final decision of the Commissioner of Social Security (Commissioner) denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq, 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standards for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on March 4, 2010, alleging that she became disabled on December 31, 2003, due to disorders of the back, degenerative arthritis, neuritis, cervical radiculopathy, and shoulder pain. (R. at 91–94). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 95, 99, 110, 114, 118). On March 4, 2011, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 35–74, 83–87). The ALJ also heard testimony from Randall Harding, a vocational expert (VE). (*Id.* at 72–83, 87–89). The ALJ denied Plaintiff's request for benefits on April 12, 2011. (*Id.* at 12–20).

Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since December 31, 2003, the alleged onset date.[3] (R. at 14). At step two, the ALJ found that Plaintiff has the following severe impairments: osteoarthritis of her cervical spine with continued difficulties following spinal fusion, neuritis, fibroids, peripheral neuropathy, a bunion, degenerative joint disease, and obesity. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments

---

[3] The ALJ determined that Plaintiff last met the Act's insured status requirements on December 31, 2008. (R. at 14). "In order to be entitled to DIB, an individual must establish that the disability arose while he or she was insured for benefits." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 348 (7th Cir. 2005). Therefore, in order to recover for benefits, Plaintiff must establish that she was disabled prior to December 31, 2008. *See Bjornson v. Astrue*, 671 F.3d 640, 641 (7th Cir. 2012) ("only if [plaintiff] was disabled from full-time work by [her last insured] date is she eligible for benefits"). The date last insured requirement does not apply to SSI claims. *Compare* 20 C.F.R. § 404.131 *with id.* § 416.202.

that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 14–15).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and determined that she can perform sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a) except that she can

lift and/or carry 10 pounds occasionally or frequently. She can stand and walk for a total of no more than about 2 hours of an 8-hour workday, and she can sit for a total of approximately 6 hours of an 8-hour workday, for a total of 8 hours. She can occasionally bend, stoop, turn, climb, push and pull.

(R. at 15). At step four, based on Plaintiff's RFC and the VE's testimony, the ALJ determined that Plaintiff is capable of performing past relevant work as a secretary. (*Id.* at 20). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id.*).

The Appeals Council denied Plaintiff's request for review on May 11, 2012. (R. at 1-6). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Vallano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent mean-

ingful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

Plaintiff was involved in a car accident in 1996. (R. at 66). She experienced neck pain and pain and numbness in her right arm on September 9, 1999. (*Id.* at 319). On October 7, 1999, an MRI scan showed C3–4 disc herniation had worsened, and Plaintiff was considering surgery. (*Id.* at 317–18). Plaintiff had anterior cervical discectomy and fusion surgery in 2000. (*Id.* at 463). The surgery relieved 40-50% of her pain, but the pain slowly returned. (*Id.* at 463). Plaintiff ceased working at the end of 2003. (*Id.* at 35, 251).

From January 10 through February 10, 2005, Plaintiff was treated by a chiropractor for lower back pain, right foot pain, and neck pain that radiated to her arm and hand. (R. at 540–45).

Plaintiff began treating with Lawrence Ngu, M.D, at Robbins Health Center on May 5, 2008. (R. at 329). On April 16, 2009, Plaintiff sought treatment at Oak Forest Hospital for right ankle pain and right knee swelling and was referred for x-rays. (*Id.* at 344). Tests were unable to visualize the neuroma and showed a normal right foot on April 17, June 25, and December 3, 2009. (*Id.* at 357, 361, 363).

On June 18, 2009, Plaintiff began podiatry appointments at Oak Forest Hospital for neuritis and was treated with injections, ultrasound treatment, and ibuprofen. (R. at 417). Plaintiff continued podiatry appointments for neuritis and peripheral

neuropathy, and showed improvement in her right foot pain. (*Id.* at 405). Initially she rated her foot pain as 6/10 on June 18, 2009. (*Id.* at 417). The foot pain reduced to the lowest point of 1/10 on September 10, October 15 and 29, and November 12, 2009. (*Id.* at 387, 402, 403, 405). Around December 17, 2009, Plaintiff suffered a burn from the ultrasound treatment and the pain returned to 3/10. (*Id.* at 398). The foot pain remained at 3/10 on April 29, 2010, and the physician noted neuritis, peripheral neuropathy,[5] bunion, and degenerative joint disease.[6] (*Id.* at 448).

While undergoing these podiatry appointments, Plaintiff also received physical therapy for neck and back pain at Oak Forest Hospital starting October 6, 2009. (R. at 385–86). In Plaintiff's first physical therapy session, she rated her neck pain as 7/10 at worst and 5/10 at best and her back pain as 5/10 at worst and 3/10 at best. (*Id.*). Plaintiff attended at least eight physical therapy appointments at Oak Forest Hospital between October 6 and December 17, 2009. (*Id.* at 372, 374, 376, 377, 378, 380, 381, 385). At the final treatment session, on December 17, 2009, Plaintiff rated her baseline neck and back pain as 3/10 and her pain with physical therapy as 2/10. (*Id.* at 372). The physical therapist noted that Plaintiff's neck and back pain felt better since therapy and that she would continue doing exercises at home. (*Id.*).

---

[5] Peripheral neuropathy is "a result of nerve damage, often causes weakness, numbness and pain, usually in your hands and feet." <http://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/basics/definition/con-20019948>

[6] Degenerative joint disease is also often called osteoarthritis and is a "degeneration or 'wear and tear' of articular (joint surface) cartilage usually accompanied by an overgrowth of bone (osteophytes), narrowing of the joint space, sclerosis or hardening of bone at the joint surface, and deformity in joints." <www.healthcentral.com/encyclopedia/408/577.html>

On December 16, 2009, Dr. Ngu completed a physical RFC assessment. (R. at 330). Dr. Ngu specializes in internal medicine, and he had treated Plaintiff every three months between May 5, 2008, and December 8, 2009. (*Id.* at 329, 332). According to Dr. Ngu, Plaintiff had severe osteoarthritis, cervical syndrome, neuropathy, and cervical/spine fusion at C3–C4. (*Id.* at 327). Plaintiff exhibited cervical stiffness. (*Id.* at 330). Plaintiff had more than 50% reduced capacity for walking, bending, stooping, climbing, pushing, pulling, and the ability to perform physical activities of daily living. (*Id.* at 332). But, Plaintiff had full capacity for standing, sitting, speaking, travel, and fine manipulations. (*Id.*). Also, Plaintiff had 20–50% reduced capacity for turning, and Plaintiff could lift no more than 10 pounds at a time. (*Id.*).

Plaintiff continued treatment at Oak Forest Hospital. On December 10, 2009, an exam of the right knee joint showed possible osteoarthritis, but no acute fracture or dislocation. (R. at 355). Following a referral to neurology, Plaintiff had her first appointment on March 10, 2010. (*Id.* at 395). Plaintiff rated her pain as 5/10 and was prescribed Neurontin.[7] (*Id.*). On March 24, 2010, Plaintiff had a CT scan of the cervical spine, which showed postsurgical changes secondary to anterior interbody fusion, but no evidence of spinal stenosis,[8] compression of the spinal cord, or nerve root was seen. (*Id.* at 349). At Plaintiff's next neurology appointment on April 6, 2010, she rated her pain as 5/10 again, and she had stopped taking Neurontin be-

[7] Neurontin is a brand name of the generic gabapentin, which prevents and controls seizures, but "may also be used to treat other nerve pain conditions." <http://www.medicinenet.com/gabapentin-oral/article.htm>

[8] Spinal stenosis "is the narrowing of spaces in the spine (backbone) which causes pressure on the spinal cord and/or nerves." <http://www.webmd.com/back-pain/guide/spinal-stenosis>

cause it made her pain worse. (*Id.* at 394). Plaintiff was referred to the pain clinic at Stroger Hospital. (*Id.* at 394).

On May 24, 2010, Vidya Madala, M.D., a DDS nonexamining physician completed a physical RFC assessment. (R. at 418–25). Dr. Madala found Plaintiff was capable of occasionally lifting 20 pounds, frequently 10 pounds, and standing, walking, and sitting about six hours in an eight-hour workday. (*Id.* at 425). Dr. Madala stated that these limitations were caused by Plaintiff's history of right foot neuritis, being neurologically grossly intact, pain rated as 3/10, strength 5/5 bilaterally, and sensation intact for light touch. (*Id.*). Plaintiff could occasionally stoop or climb a ramp or stairs, but she could never climb a ladder, rope, or scaffolds. (*Id.* at 420). This finding was based on evidence of peripheral neuropathy, neuritis, bunion, and degenerative joint disease in her right foot. (*Id.*). Dr. Madala found insufficient objective medical evidence to support Dr. Ngu's conclusions and did not give the treating source controlling weight. (*Id.* at 425). Dr. Madala found Plaintiff "credible with regard to symptomology, but not the severity." (*Id.*).

Plaintiff began treatment at the Stroger pain clinic on July 1, 2010. (R. at 459). Plaintiff rated her pain as 8/10 and was diagnosed with cervical radiculopathy and muscle pain in her shoulders. (*Id.* at 464). During intake at the pain clinic, Plaintiff responded that pain had forced her to stop working, and that pain had caused a change in feelings about herself, caused a strain on her as a caregiver, and altered her functional capacity. (*Id.* at 461). Plaintiff complained of pain in her neck, shoulder, upper back, lower back, right foot, lower leg, and down her right arm with tin-

gling that could be sharp and stabbing or dull and sore. (*Id.* at 462). Plaintiff had been taken off ibuprofen because of some anemia and possible gastritis. (*Id.* at 463). Plaintiff was prescribed tramadol and gabapentin, but was taken off of gabapentin because of tiredness and an upset stomach.[9] (*Id.*). Plaintiff was told to restart gabapentin at a lower dosage. (*Id.*).

Plaintiff returned to Stroger on September 2, 2010. (R. at 468). Plaintiff reported her pain as 7/10. (*Id.* at 468). Plaintiff once again stopped taking gabapentin because of diarrhea and dizziness, and at this point she was taking only Tylenol. (*Id.* at 468). Plaintiff was referred to a psychologist for an assessment of mood and coping mechanisms. (*Id.* at 466, 468). At the psychiatric evaluation on October 5, 2010, Plaintiff was eager to learn how to manage her chronic pain with a multidisciplinary approach. (*Id.* at 580). Plaintiff missed an appointment in October 2010, but otherwise she continued to have monthly psychology appointments through March 17, 2011. (*Id.* at 573–75, 577, 579).

On October 6, 2010, another DDS nonexamining physician, Reynaldo Gotanco, M.D., completed a physical RFC assessment after Plaintiff had applied for reconsideration due to worsened neck pain since March 2010. (R. at 471, 477). Dr. Gotanco agreed with Dr. Madala's assessment of Plaintiff's exertional limitations, and had similar findings for postural limitations except that Plaintiff could only occasionally crouch, and could occasionally climb a ladder, rope, or scaffolds rather than never

---

[9] Tramadol is a "narcotic-like pain reliever" used to treat moderate to severe pain. <http://www.drugs.com/tramadol.html>

climb them. (*Id.* at 471). In making his findings, Dr. Gotanco noted that subjectively Plaintiff complained of sharp and shooting pain from the back of her head, down her shoulders and right arm, which went up to an 8/10 in intensity. (*Id.* at 471). Dr. Gotanco noted that Plaintiff's surgery had relieved the pain by 40–50%, but that it had returned and gotten worse recently. (*Id.*). Objectively, Dr. Gotanco noted that the muskoskeletal exam was negative, and there were no abnormalities in joints or extremities. (*Id.* at 472). Examination of Plaintiff's neck reproduced pain, there was limited range of motion in bilateral shoulders, there was bilateral tenderness in the neck and back of head, and muscle strength was 5/5 bilaterally. (*Id.*). Plaintiff was limited in reaching in all directions due to a mild limitation of range of motion in her shoulders that was exacerbated by cervical spine pain. (*Id.* at 473). Dr. Gotanco found that the "severity of symptoms and alleged effect on functions are consistent with all evidence in file, thus credible." (*Id.* at 475).

Plaintiff underwent further tests at Stroger Hospital. On October 14, 2010, Plaintiff received a cervical spine x-ray for possible stenosis and a foot x-ray for possible fracture. (R. at 600–01). The cervical spine x-ray results showed a "loss of normal cervical spine lordosis," "obliteration of the intervertebral space and extensive degenerative changes in the mid and lower cervical spine." (*Id.* at 600). But, no gross evidence of fracture or dislocation was found. (*Id.*). Plaintiff was referred for a CT or MRI. (*Id.*). The foot x-ray showed "no gross evidence of displaced acute fracture or dislocation," but there were "minimal degenerative changes in the bilateral first MTP" and bilateral calcaneal spurs. (*Id.* at 601). Plaintiff received an EMG on

October 21, 2010, after describing ongoing severe pain in her right arm from shoulder to hand. (*Id.* at 598). The EMG findings were consistent with carpel tunnel, but no evidence of cervical radiculopathy was identified. (*Id.* at 598). The follow-up MRI of Plaintiff's cervical spine for possible radiculopathy was most remarkable for posterior central disk extrusion at C4–C5 on November 19, 2010. (*Id.* at 596–97).

At Plaintiff's psychotherapy appointment on January 27, 2011, she complained of "black out" episodes that could last one or two hours where she lost vision completely. (R. at 575). Plaintiff was referred to the emergency room for these episodes. (*Id.*). Plaintiff reported to the emergency room at Stroger Hospital complaining of severe dizziness, headache, and sometimes seeing spots. (*Id.* at 586–87). On February 25, 2011, a CT exam of Plaintiff's head showed no acute intracranial abnormality. (*Id.* at 594).

At the hearing on March 4, 2011, Plaintiff stated her main health problem was chronic pain in the back of her head, down her neck, across both shoulders, and down her right side, arm, hand, and her lower back. (R. at 38). Plaintiff takes amitriptyline for depression, and prescription strength ibuprofen three times a day and prescription strength Tylenol four times a day for the pain. (*Id.* at 40, 59). Plaintiff used to take gabapentin, but she was taken off of it because it made her feel dizzy and sick to her stomach. (*Id.* at 58–59, 62). Plaintiff could not drive while taking Neurontin (a brand of gabapentin), and she had to lie down more than an hour a day. (*Id.* at 62–63). Plaintiff typically takes her medications on a schedule, but sometimes she doesn't take them when they make her dizzy and nauseous. (*Id.* at

39–40). The medication typically makes her feel groggy like she cannot wake up, and so she did not take it the day of the hearing. (*Id.* at 49–50). Plaintiff also does physical therapy exercises twice a day, wears a heating pad almost all day, gets massages, and takes hot showers to help with the pain. (*Id.* at 40–41). Plaintiff said theses methods help very little. (*Id.* at 41). Plaintiff rated her pain as 9/10 with or without her medication. (*Id.* at 48, 50). Plaintiff stated that the pain radiates and is present 99% of the time. (*Id.* at 51). Plaintiff's neck pain feels like it is popping, cracking, or breaking. (*Id.* at 52). Plaintiff rated the pain in her right knee as 7/10, and pain in her right foot as 10/10, which she says goes down to 8/10 or 9/10 with medication. (*Id.* at 64).

At night, Plaintiff props herself up on pillows because she cannot lay flat, and in the morning she feels numb and she has to hang her arm over her head and roll onto her stomach and to her knees before she can stand. (R. at 41). Plaintiff only leaves the house two or three times a week to go to church, the grocery story, and to get gas. (*Id.* at 46). Plaintiff cannot get through her two-hour church service without standing up. (*Id.* at 47). Plaintiff estimated that she could stand and walk for half an hour at the grocery store. (*Id.* at 54). Plaintiff can zip her jacket with her left hand, but she has trouble gripping a pencil to write. (*Id.* at 55–56). Plaintiff has been dropping things for a couple of years off and on. (*Id.* at 63). Plaintiff wears gym shoes because of pain in her right foot. (*Id.* at 63–64).

# V. DISCUSSION

Plaintiff contends that the ALJ improperly analyzed Plaintiff's credibility. Plaintiff asserts that the ALJ improperly relied on meaningless boilerplate, improperly analyzed RFC before credibility, mischaracterized the evidence, and failed to analyze the side effects of Plaintiff's medications. (Mot. 3–9). Plaintiff claims these defects invalidate the ALJ's RFC assessment. (*Id.* 13).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [her] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR) 96-7p.[10] An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not sup-

---

[10] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administering." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

ported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

At the hearing, Plaintiff described her main health problem as chronic pain located in her head, neck, shoulders, lower back, and down into her arms, hands, and feet. (R. at 38). The pain radiates down her back, and is present 99 percent of the time. (*Id.* at 51). Plaintiff takes Amitriptyline for depression and prescription-strength Tylenol and ibuprofen for her pain, but sometimes they make her dizzy and nauseous. (*Id.* at 40). She was prescribed a stronger pain medication, Neuron-

tin, but she was taken off of it because it made her feel drunk or dizzy and sick to her stomach. (*Id.* at 62). Plaintiff stated she could not drive while taking Neurontin, and she had to lay down more than an hour a day while taking it. (*Id.* at 63). Plaintiff stated she could sit for half an hour, stand for 10 minutes, and walk for half an hour. (*Id.* at 53). Plaintiff testified that, at most, she could spend two hours on her feet in an eight-hour workday with all of the breaks necessary to do that. (*Id.* at 65). Plaintiff only leaves her house two or three times a week in order to go to church, the gas station, and the grocery store. (*Id.* at 46). But, she sometimes has to miss church services when she is not feeling well. (*Id.*). She also sometimes has to stand up during her hour or hour and a half church service. (*Id.* at 47–48).

The VE testified that an individual that can sit, stand, or walk for less than two hours each in an eight-hour workday, "can lift less than 10 pounds occasionally or frequently, and would need to be permitted to take breaks throughout the day on an as needed basis" would be unable to perform claimant's past work or any other work. (R. at 82). Additionally, someone who had to nap for an hour during unscheduled breaks would be unable to perform any work. (*Id.* at 89). Finally, someone who would be off task due to pain, or medication side effects, for more than 15% of the day would be unable to perform any work. (*Id.*).

In the ALJ's decision, she recited the factors that must be considered in a credibility determination and then used the boilerplate statement:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symp-

toms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 16). Similar boilerplate language has been cause to remand in other cases because it "yields no clue to what weight the trier of fact gave the testimony." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). "However, the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013). Here, the ALJ proceeded to give reasons for her credibility determination after the boilerplate statement. Therefore, the presence of the boilerplate language alone does not require remand.

The ALJ's statement also implied that the RFC was determined before the credibility assessment. If the ALJ truly determined the RFC before credibility, it would "turn[] the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." *Brindisi ex. rel. Brindisi v. Barnhart*, 315 F.3d 783, 787–88 (7th Cir. 2003). Under the circumstances, the ALJ should have determined Plaintiff's credibility on the merits instead of determining his statements to be incredible largely because of their inconsistency with the ALJ's RFC determination.

While it is clear that the ALJ did not rely solely on boilerplate language, it is somewhat unclear which portions of her opinion related to credibility. Immediately following the boilerplate language, the ALJ went on to state:

The claimant testified she does not have a handicapped parking permit but had her doctor complete the paperwork for one in December 2009 (Exhibit 11F). The claimant has not, however, provided the completed forms to the Department of Motor Vehicles. The treatment records of evidence do not indicate any major problem and do show that the claimant's symptoms are improving with treatment, her pain was only 1 out of 10 (Exhibits 10F and 9F). There is evidence that the claimant has not been entirely compliant in taking prescribed medications, which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application.

(R. at 17). The ALJ then recited some of the objective medical evidence, and stated, "Pain clinic notes of September 2010 indicate within a couple of months the claimant is now only taking Tylenol for her pain and it is helping." (*Id.*). Similarly, the ALJ noted Plaintiff's treatment with a chiropractor in 2005, and stated, "With minimal treatment sessions and low strength medication there appears to be no severe ongoing pain." (*Id.*).

The ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (citing *Dixon v. Massnari*, 270 F.3d 1171, 1176 (7th Cir. 2001)). None of the reasons provided by the ALJ for rejecting Plaintiff's credibility are legally sufficient or supported by substantial evidence.

First, whether or not the Plaintiff had a handicapped parking placard does not affect Plaintiff's credibility. There was no evidence that Plaintiff was untruthful about having a handicapped parking placard. Plaintiff also did not claim to have difficulty walking from her car to church or the grocery store, which are the only places Plaintiff drives aside from the gas station. If the ALJ had concerns, she could have asked Plaintiff how far away she had to park from church or the grocery store or why she did not turn in the handicapped parking placard paperwork.

Second, the ALJ based her decision on the lack of evidence of "any major problem" and evidence that treatment was successful at lessening Plaintiff's pain. (R. at 17). In this area, the ALJ identified only evidence that supported her position and failed to consider all of the evidence. The ALJ cannot discuss only those portions of the record that support her opinion. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted). Twice in the ALJ's opinion, she stated that Plaintiff's pain was improving and was only rated as 1/10. (R. at 17). However, all of these low pain ratings came from podiatry appointments between August 2009 and November 2009. (*Id.* at 387, 402, 403, 406, 408). Presumably, the Plaintiff was only rating her foot pain rather than her overall pain. During the same time period, Plaintiff also attended physical therapy appointments where her neck and back pain ratings fluctuated within the range of 2/10 to 7/10. (*Id.* at 374, 380, 381, 385). The ALJ even cited to the record of a pain clinic appointment in September 2010 to discuss Plaintiff's medication and Plaintiff's improving condition, but the ALJ did not mention that in the same appointment, Plaintiff rated her pain as 7/10. (*Id.* at 468).

The most recent pain ratings in the medical evidence are from a psychology appointment on November 18, 2010, and an emergency room visit on January 27,

2011. (R. at 579, 585). At the psychology appointment, Plaintiff rated her headache as 7/10, her neck pain as 8/10, her shoulder pain as 8/10, and her lower back pain as 6/10. (*Id.* at 579). During the emergency room visit, Plaintiff originally rated her pain as 6/10, and later that day as a 7/10. (*Id.* at 585, 589). At the hearing, Plaintiff rated her pain as 9/10. (*Id.* at 48).

Similarly, the claim that Plaintiff had "no major problems" ignores over two years of treatment records and the ALJ's own finding that Plaintiff suffered from severe impairments including "osteoarthritis of her cervical spine with continued difficulties following spinal fusion, neuritis, fibroids, peripheral neuropathy, a bunion, hallux abductovalgus, degenerative joint disease, and obesity." (R. at 14). Even if the ALJ considered these impairments "severe" but not "major," a claimant's allegations of disabling pain cannot be disregarded merely because there is no objective medical evidence. *See Moss*, 555 F.3d at 561; SSR 96-7p. Plaintiff's allegations of chronic pain and the medical evidence of a continual course of treatment certainly signify a major problem. By only discussing pain ratings of 1/10 and claiming that Plaintiff had no major problems the ALJ discussed only the portions of the record that supported her conclusion and failed to consider all of the evidence in making her credibility determination.

Third, the ALJ drew conclusions from Plaintiff's use of medication. The ALJ claimed that Plaintiff was not "entirely compliant in taking prescribed medications," and drew the conclusion that "the symptoms may not have been as limiting as the claimant has alleged in connection with this application." (R. at 17). The ALJ

seemed suspicious of Plaintiff's medication at other points in the opinion saying Plaintiff "is now only taking Tylenol" and calling Aleve "low strength medication." (*Id.* at 17). Plaintiff's noncompliance and the use of her medications were both listed as factors that the ALJ considered in her credibility determination. (*Id.* at 20). The ALJ did not identify any evidence in the record that Plaintiff was noncompliant in taking her medications. On the contrary, there is evidence in the record that Plaintiff stopped taking gabapentin multiple times because it made her sick. Additionally, the record shows that Plaintiff did not take her medication on the day of the hearing, but when asked, she stated that she did not take the medication because it made her groggy and she would have been unable to function. (*Id.* at 49–50). The ALJ cannot draw inferences from Plaintiff's failure to pursue or maintain treatment without considering the Plaintiff's explanations for these failures. *See Craft*, 539 F.3d at 679; SSR 96-7p. Negative side effects are a recognized explanation that the ALJ did not address. *See Myles*, 582 F.3d at 677 ("Inability to pay for medication or negative side effects from medication may excuse failure to pursue treatment."). The ALJ failed to describe how Plaintiff was noncompliant and to consider possible explanations for the noncompliance including side effects of her medication. Therefore, there is insufficient support in the record for the ALJ's claim that Plaintiff was not entirely compliant in taking her medication.

Similarly, the ALJ's focus on Plaintiff's "low strength medication" and minimal treatment sessions as evidence that there were no major problems is not supported. Plaintiff was placed on a prescription strength pain medication, gabapentin, but

had to stop taking it due to side effects. As of the date of the hearing, Plaintiff was taking prescription strength ibuprofen three times a day and prescription strength Tylenol four times a day for her pain. (R. at 40, 59). Such a routine does not appear low strength or minimal, and does not support a negative credibility finding.

The ALJ also noted that Plaintiff had received "minimal treatment sessions" based on four treatments from a chiropractor in January 2005. (R. at 17). The record does show a lack of consistent treatment prior to 2008. The ALJ did not inquire as to the reasons for Plaintiff's lack of treatment before she began seeing Dr. Ngu at Robbins in 2008, so the reasons are unknown. However, even if the evidence fails to support Plaintiff's claim that she was disabled beginning in 2003, the ALJ cannot ignore evidence establishing a later onset date. *See* SSR 83-20, at *1 (the ALJ establishes the onset date of disability); *accord Briscoe*, 425 F.3d at 352. The record shows a consistent, significant series of treatment after 2008. (R. at 326–417). At the hearing, Plaintiff's counsel specifically noted that they were open to amending to a later onset date such as 2008 when Plaintiff first started treatment at Robbins. (*Id.* at 36–37). Therefore, a lack of consistent treatment prior to 2008 does not support a negative credibility finding of Plaintiff's current pain and symptoms.

In sum, the ALJ has failed to "build an accurate and logical bridge from evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). On remand, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of

medical evidence.[11] *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). If the ALJ finds good reasons for not considering this evidence, the ALJ shall provide explicit reasons for her decision not to do so. The ALJ shall then reevaluate Plaintiff's physical impairments and RFC, considering all of the evidence in the record, including Plaintiff's testimony, and shall explain the basis of her finding in accordance with applicable regulations and rulings.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [15] is **GRANTED**, and Defendant's Motion for Summary Judgment [20] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: April 16, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge

---

[11] Because the Court is remanding on credibility, the Court chooses not to address Plaintiff's other arguments.